# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

№ 26-CV-6545 (RER)

P.A.G.C.

VERSUS

GENALO, *ET AL.*

**MEMORANDUM & ORDER**

**RAMÓN E. REYES, JR., District Judge:**

Petitioner P.A.G.C. ("Petitioner" or "Mr. G.C.") has petitioned the Court for a writ of habeas corpus under 28 U.S.C. § 2241. (ECF No. 1 ("Pet."); *see also* ECF Nos. 6 ("Gov't Opp'n") and 8 ("Pet. Reply")). The Court's "only job today is to give the law's terms their ordinary meaning and, in that small way, ensure the federal government does not exceed its statutory license." *Niz-Chavez v. Garland*, 593 U.S. 155, 171 (2021). For the reasons explained below, the Court GRANTS the petition.

## BACKGROUND

### I. Factual Background

Mr. G.C. is a native and citizen of Guatemala. He has been living in New York City since 2021.

On August 29, 2026, Immigration & Customs Enforcement ("ICE") Enforcement and Removal Operations ("ERO") officers from the New York City Fugitive Operations Team 9 were conducting surveillance operations in Brooklyn, NY. (Pet., Ex. A at 2). As part of that broader operation, officers were conducting a targeted enforcement action to

locate and arrest an individual pursuant to a Warrant for Arrest (Form I-200) at their last known address. (*Id.*)

At around 6:34 P.M., several blocks from the target location, ICE officers confronted Mr. G.C. and his two coworkers in front of a gas station to gather information on the intended target. (Pet. ¶ 20; Pet., Ex. A at 2). The officers showed Mr. G.C. and his coworkers a photograph and asked if they knew the person; Mr. G.C. and his coworkers said that they did not. (Pet. ¶ 21). Mr. G.C. gave the officers his name. (Pet., Ex. A at 2). The officers asked if he had any identification; Mr. G.C. presented a Guatemalan identification card and said he was a Guatemalan citizen. (*Id.*). The officers asked how he entered the United States; Mr. G.C. said he entered without inspection. (*Id.*). After running records checks, the officers positively identified Mr. G.C., confirmed he entered the United States without inspection, and learned he had no criminal record. (*Id.* at 2–3). At 6:47 P.M., less than fifteen minutes into the encounter, the officers issued a Warrant for Arrest (Form I-200); and at 6:50 P.M., ICE took Mr. G.C. into custody. (*Id.* at 2). The officers then transported Mr. G.C. to 26 Federal Plaza for processing. (*Id.*).

At approximately 9:30 P.M., ICE conducted an initial custody determination. (Gov't Opp'n, Exs. 2 and 3). The examining officer indicated Mr. G.C. established that he "does not pose a danger to persons or property" and "does not pose a flight risk," but nevertheless determined that Mr. G.C. should be detained. (Gov't Opp'n, Ex. 3).[1]

---

[1] Citing the same exhibit, the Government incorrectly states "ICE determined that Petitioner had not established that he did not pose a flight risk." (Gov't Opp'n at 2). But the form contains another question: "If the noncitizen does pose a flight risk, have you determined that no forms of release on conditions can mitigate the risk of flight?" To this, the officer indicated "Yes," implying that the officer determined that Mr. G.C. "does pose a flight risk." The officer then lists several factors presumably related to flight risk. Based

Later that day, at approximately 11:40 P.M.,[2] ICE issued and served a Notice to Appear. (Pet., Ex. B). The following day, at 12:07 A.M., the Department of Homeland Security ("DHS") filed the Notice to Appear in the immigration court electronic filing system. (*Id.*) (containing Executive Office of Immigration Review ("EOIR") timestamp).

At some point thereafter, Mr. G.C. was transported to Delaney Hall in Newark, NJ, where he was detained until transferred to the Metropolitan Detention Center in Brooklyn, NY, where he remains detained under 8 U.S.C. § 1226(a). (Pet. ¶¶ 22, 26; Gov't Opp'n at 2).

II. Procedural History

On October 9, 2026, Mr. G.C filed the petition for writ of habeas corpus. That same day, the Court ordered Respondents to show cause why the writ should not be granted (ECF No. 4). On October 16, 2026, the government responded. On October 19, 2026, Mr. G.C. replied.

Mr. G.C. argues his arrest and detention violated 8 U.S.C. § 1226(a), its implementing regulations, and due process (Pet. 7); his continued detention violates due process (*id*. at 12–13); his interrogation violated the Fourth Amendment (*id*. at 13–14);

---

on these context clues, it appears the officer meant to indicate what the government avers: that Mr. G.C. had not established that he does not pose a flight risk. Even if the Court takes the form to mean what the government intends it to say rather than what it actually indicates—a lenity the government does not generally extend to noncitizens—it does not change the outcome here. For these purposes, it simply highlights that "the federal government finds some of its forms frustrating too." *Niz-Chavez*, 593 U.S. at 157.

[2] The Court is also unable to discern the precise time from the small and blurry text, (Pet. at 6 n.2), but the Court accepts Petitioner's reading for argument's sake because the government confirms that arrest preceded NTA issuance (Gov't Opp'n at 1), and the documents confirm that filing occurred after both (Pet., Ex. B) (NTA dated August 29, and EOIR timestamped August 30).

because the arrest occurred before the NTA was issued, it was a warrantless arrest in violation of the Fourth Amendment and 8 U.S.C. § 1357(a)(2) (*id*. at 14–16, 23–24); his arrest violated the Administrative Procedure Act and the *Accardi* doctrine (*id*. at 24–26); and, the proper remedy for the unlawful arrest and detention is his immediate release (*id*. at 16–19).

The government's response focuses almost exclusively on the individualized custody determination: that officers conducted one within a few hours after the arrest (Gov't Opp'n. at 3); that "ICE reasonably exercised its discretion in determining that Petitioner posed a flight risk" (*id*.); that the statute "jurisdictionally bars courts from reviewing that determination" (*id*.); that administrative proceedings provide sufficient recourse, and that Petitioner must exhaust those remedies before seeking federal review (*id*. at 4).

The government does not respond to Petitioner's claims regarding his interrogation. The government does not respond to Petitioner's argument that pre-NTA arrest constitutes a warrantless arrest, nor does it dispute that it violated 8 U.S.C. § 1357(a)(2). The government does not dispute that it violated 8 C.F.R. § 236.1(b)(1). Indeed, it appears to concede the violation, but submits, in a footnote, that "the relative sequence of the warrant for arrest and NTA does not present a question of constitutional dimension." (Gov't Opp'n at 2 n.2) (citing *Gamez-Quintanilla v. Arteta*, --F. Supp. 3d--, 2026 WL 2517655, at *2 (S.D.N.Y. Aug. 26, 2026)).

## DISCUSSION

I. Petitioner's Arrest and Detention Violated 8 U.S.C. § 1226(a)

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), 110 Stat. 3009–546, permits the government to arrest and detain noncitizens under 8 U.S.C. § 1226(a). But the government must satisfy two conditions before it exercises that authority: it may arrest and detain only "[o]n a warrant"; and only "pending a decision on whether the alien is to be removed from the United States." The former tells the government *what* it must do to exercise its discretion to arrest and detain, the latter tells the government *when* it may exercise that discretion.

It is well-settled that this power to arrest and detain persists throughout the pendency of removal proceedings until the immigration judge enters a final order of removal. *Jennings v. Rodriguez*, 583 U.S. 281, 304 (2018); *Demore v. Kim*, 538 U.S. 510, 531 (2003). The unsettled question is when that power *begins*—that is, at what point does a removal decision become "pending" for purposes of section 1226(a). Nearly every court in this circuit has concluded that the government's power to arrest and detain begins when the government *issues* a Notice to Appear. *See Sergio Quinero Meza v. Genalo*, No. 26 Civ. 7214 (VSB), 2026 WL 2875630, at *2 (S.D.N.Y. Sept. 24, 2026) (collecting cases).[3]

[3] *But see Cedeno Carreno v. Bondi*, No. 2:26-cv-1180 (NJC), 2026 WL 2969838, *6 (E.D.N.Y. Oct. 2, 2026) ("When a Notice to Appear has *not* even been *issued* by ICE—much less filed with EOIR, as required to actually commence removal proceedings—no removal proceedings have been initiated and there is no basis to arrest and detain a noncitizen under Section 1226(a), which according to its plain text, *only* permits such arrest and detention '*pending a decision* on whether the alien is to be removed from the United States.'") (emphasis in original); *Loaeza v. Bausch*, --F. Supp. 3d--, 2026 WL 2150155, *2 (W.D.N.Y. July 27, 2026) ("Because removal proceedings were not pending against Mr. Loaeza when he was arrested on May 8 under the purported authority of § 1226(a), Respondents had no statutory authority to make the arrest or to detain him under that provision.").

But the statutory text, structure, and history show that the government's authority to arrest and detain begins only when the government files the NTA with the immigration court.

A. <u>8 U.S.C. § 1226(a) Limits Arrest and Detention to Pending Removal Proceedings</u>

*i. Statutory Text*

Courts must "interpret statutes 'based on the traditional tools of statutory construction, not individual policy preferences.'" *Barbosa da Cunha v. Freden*, 175 F.4th 61, 71 (2d Cir. 2026), *cert. granted sub nom. Rhoney v. Barbosa da Cunha*, No. 26-104, 2026 WL 2942994 (U.S. Oct. 1, 2026) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024)). The Court begins "'by examining the language of [the] statute, starting with the common meaning of the words in it." *Id*. (citation omitted). "'When the statutory text is plain and unambiguous, our sole function is to enforce it according to its term.'" *Id*. (citation omitted).

Section 1226(a) provides: "On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). This provision prescribes how ("on a warrant") and when ("pending a decision") an alien may be arrested and detained. The phrase "pending a decision" presupposes the existence of some proceeding in which a removal decision will be made. The proceeding contemplated by section 1226(a) is a removal proceeding under section 1229a. The link is evident. Section 1226(a) describes "a decision on whether the alien is to be removed," section 1229a(a)(3) makes removal proceedings the "sole and exclusive procedure" for making that decision, and section 1229a(c)(1)(A) directs the immigration judge to make that decision.

A decision is "pending" when it remains undecided and awaits decision. *Pending,* BLACK'S LAW DICTIONARY (10th ed. 2014). The paradigmatic pending matter is a case on a court's docket, and a case reaches the docket when it is filed. *See* Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the court."); Fed. R. App. P. 3 ("An appeal permitted by law as of right from a district court to a court of appeals may be taken only by filing a notice of appeal"). This bright-line filing rule tracks the logic inherent in the word "pending." A decision cannot be pending in the ordinary sense before the decisionmaker has been asked to make it. An indictment or complaint that sits in a cabinet drawer is not awaiting a decision—it is awaiting filing. Those documents might, in a metaphysical sense, be awaiting a decision; in that sense, everything is awaiting a decision. But in a legal sense, filing in the appropriate tribunal is the formal mechanism for commencing a proceeding in which a decision will be made.[4]

Moreover, "pending a decision" modifies both "arrested and detained" in section 1226(a). A modifier that follows two parallel verbs ordinarily applies to both. *See Facebook, Inc. v. Duguid*, 592 U.S. 395, 402–03 (2021) (applying the series-qualifier canon). Congress did not authorize arrest at any time and detention only when removal

[4] Federal regulations reinforce this filing logic. Removal proceedings are "commenced by the filing of a notice to appear with the immigration court." 8 C.F.R. § 1239.1(a); 8 C.F.R. § 1003.14(a) ("Jurisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court . . ."); 8 C.F.R. § 1001.1(dd) (defining "filing" as "the actual receipt of a document by the appropriate immigration court or the Board of Immigration Appeals). The NTA itself states that "[t]his notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings." DHS Form I-862.

proceedings commence; it authorized both "pending a decision." Until the decision is pending, section 1226(a) authorizes neither.[5]

The statutory meaning is thus plain and unambiguous: section 1226(a) authorizes arrest and detention on a warrant pending a removal decision. That authority begins the moment an immigration judge is asked to make a removal decision, and it ends the moment an immigration judge makes its removal decision.[6]

*ii. Statutory Structure*

The text alone is enough to resolve the question. But the plain language is reinforced by "the statutory context, structure, history, and purpose." *Barbosa da Cunha*, 175 F.4th at 71. If Congress had wanted section 1226(a) to authorize arrest and detention prior to the commencement of removal proceedings, it would have said so, as it did repeatedly throughout the statute. For example, noncitizens indicating an intent to apply for asylum or a credible fear of persecution "shall be detained for further consideration of the application for asylum," 8 U.S.C. § 1225(b)(1)(B)(ii), and other applicants for admission "shall be detained for a [removal] proceeding," 8 U.S.C. § 1225(b)(2)(A). The word "for" in these provisions carries both a purposive meaning ("with the object or purpose of") and a durational meaning ("during" or "throughout"). *See Jennings*, 583 U.S.

---

[5] The government notes, without analysis, that "the statute separates arrest from detention." (Gov't Opp'n at 2). But the result would be the same even if "pending a decision" modified only "detained." On that view, section 1226(a) might permit arrest upon issuance of a Notice to Appear, but the statute would still permit detention only while a decision is pending. Either way, detention prior to commencement is not authorized by section 1226(a).

[6] If the noncitizen appeals the removal decision, and a court stays removal, section 1226(a) continues to govern detention until the stay is lifted. 8 U.S.C. § 1231(a)(B)(ii); *Hechavarria v. Sessions*, 891 F.3d 49, 57 (2d Cir. 2018), *as amended* (May 22, 2018).

at 301–302. On that reading, detention "for" a proceeding mandates detention at inspection or on a credible-fear finding for the purpose of removal proceedings to come and throughout the pendency of those proceedings. That reading "align[s] with the way Congress has historically used that word." *Id*. at 302. Section 1225(b)'s predecessor used "shall be detained for further inquiry" to authorize detention for the purpose of the inquiry to come and throughout that inquiry. *Id*. ("Congress obviously did not mean to allow aliens to feel free to leave once immigration officers asked their first question.").

Section 1226(a) is phrased differently. "Pending a decision" describes not a purpose but a temporal relationship. It attaches arrest and detention to a present and ongoing proceeding in which a decision will be made, not for the purpose of a proceeding yet to come.[7] "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted). Congress' use of "pending" in section 1226(a) was an intentional departure from section 1225(b)'s anticipatory detention scheme. Had Congress meant section 1226(a) to reach detention for the purpose of removal proceedings not yet commenced, it would have used "for," not "pending."

This reading also harmonizes with the broader statutory scheme. To prevent flight prior to removal proceedings, section 1357(a)(2) authorizes warrantless arrest of a

[7] Expressing "pending" in its present participle form—"the decision pending is whether the alien is to be removed from the United States"—provides further confirmation that the statute contemplates arrest and detention authority attaching to present and ongoing removal proceedings. *Cf. Barbosa da Cunha*, 175 F.4th at 74 ("The term 'seeking' is in the present participle form, which expresses present action.").

noncitizen who "is likely to escape before a warrant can be obtained for his arrest," and requires that the person be taken "without unnecessary delay for examination." 8 U.S.C. § 1357(a)(2). To prevent flight during removal proceedings, section 1226(a) permits arrest and detention on a warrant once removal proceedings are under way. Whatever concerns the government may have about flight prior to removal proceedings, Congress addressed them in section 1357(a)(2). Reading section 1226(a) to cover the pre-filing period would swallow section 1357(a)(2). Why conduct a warrantless arrest under section 1357(a)(2) when the government can avoid those procedural safeguards by simply issuing a warrant in conjunction with the NTA? The condition on warrantless arrest—that the noncitizen be "likely to escape before a warrant can be obtained"—would rarely constrain anything given that the government can issue an NTA and an arrest warrant with considerable ease. Where Congress has addressed a specific situation with a specific and limited grant of authority, courts do not read a general grant to permit what the specific one withholds. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645–46 (2012) ("the [general/specific] avoids not contradiction but the superfluity of a specific provision that is swallowed by the general one"). Here, Congress addressed a specific situation—pre-filing flight—with a specific and limited grant of authority—section 1357(a)(2)—and courts must not read section 1226(a) to permit pre-filing custody as a shortcut around the requirements Congress prescribed in section 1357(a)(2). *See infra* Section III (discussing section 1357(a)(2) in greater detail).

*iii. Statutory History*

Although legislative history carries little weight when the statute is unambiguous, *Barbosa da Cunha,* 175 F.4th at 88, the history of section 1226(a) confirms that detention

authority has always been tied to the adjudication of deportability, and that the point at which the adjudication begins has followed the adjudicator.

The Immigration and Nationality Act of 1952 provided that, "[p]ending a determination of deportability in the case of any alien as provided in subsection (b)," the alien could be arrested and taken into custody on a warrant of the Attorney General. INA § 242(a), 66 Stat. 163, 208–09 (1952). Subsection (b), in turn, provided that a "special inquiry officer shall conduct proceedings under this section to determine the deportability of any alien." *Id.* § 242(b). Under that scheme, INS officers functioned as both prosecutor and judge; the regulations used the terms "special inquiry officers" and "immigration judges" interchangeably. 38 Fed. Reg. 8590 (Apr. 4, 1973).[8] Because there was no separate body in which to file a charging document, a determination of deportability became pending the moment the order to show cause was issued and served. 8 C.F.R. § 242.1 (1957); 22 Fed. Reg. 9796 (Dec. 6, 1957).

In 1983, the Attorney General created EOIR "to combine the functions performed by INS special inquiry officers (now immigration judges) and the Board of Immigration Appeals (Board) into a single administrative agency within the Department of Justice, separate from the former INS." 74 Fed. Reg. 2337 (Jan. 15, 2009); 48 Fed. Reg. 8038 (Feb. 25, 1983). "This administrative structure separated the administrative adjudication functions from the enforcement and service functions of the former INS, both for

---

[8] This structure prompted due process challenges. *See, e.g.*, *Wong Yang Sung v. McGrath*, 339 U.S. 33, 46, *modified*, 339 U.S. 908 (1950); *Marcello v. Bonds*, 349 U.S. 302, 305–311 (1955).

administrative efficiency and to foster independent judgment in adjudication." 74 Fed. Reg. 2337 (Jan. 15, 2009).

Following the reorganization, EOIR established uniform rules for deportation proceedings. 52 Fed. Reg. 2931 (Jan. 29, 1987). The new regulations provided that "[j]ursidiction vests and proceedings before an Immigration Judge commence when a charging document is filed with the Office of the Immigration Judge." *Id*. at 2937 (8 C.F.R. § 3.14).[9] The regulations defined "filing" as "the actual receipt of a document by the appropriate Office of the Immigration Judge." *Id*. (8 C.F.R. § 3.13). And in these proceedings, "the alien shall be known as the respondent." *Id*. at 2939 (8 C.F.R. § 242.1(a)).

That was the scheme in place when Congress enacted IIRIRA in 1996. IIRIRA preserved the distinction between inadmissible and deportable noncitizens, *Barbosa da Cunha*, 175 F.4th at 72, and directed immigration judges to "conduct proceedings for deciding the inadmissibility or deportability of an alien." § 1229a(a)(1). But IIRIRA "eliminated the bright-line distinction between exclusion and deportation" proceedings, channeling both inadmissible and deportable noncitizens into a single proceeding called a "removal proceeding." *Barbosa da Cunha*, 175 F.4th at 72. Section 1226(a) authorized arrest and detention "pending a decision on whether the alien is to be removed," a

---

[9] 52 Fed. Reg. 2931, 2938 (Jan. 29, 1987) (8 C.F.R. § 3.29) ("All documents and application to be considered in a proceeding before an Immigration Judge must be filed with the Office of the Immigration Judge"); *id*. at 2939 (8 C.F.R. § 242.1) ("Every proceeding to determine the deportability of an alien in the United States is commenced by the filing of an order to show cause with the Office of the Immigration Judge.").

decision made exclusively in removal proceedings by an immigration judge. Six years later, Congress transferred the Service's enforcement functions to the new Department of Homeland Security while leaving the immigration judges in the Department of Justice, completing the institutional separation between the immigration officials who charge removability and the immigration judges who decide removability. *See* 6 U.S.C. §§ 251, 521, 557.

Throughout this history, the principle has remained constant: arrest and detention under the predecessor provisions and under section 1226(a) has been authorized pending a decision from a decisionmaker charged with determining removability. When the decisionmaker sat within the charging agency, the case reached it when the agency issued the charge. Since the decisionmaker became a separate tribunal, the case reaches it when the charge is filed. Congress enacted section 1226(a) against that settled understanding, and nothing in the new text suggests that it meant to move the starting point earlier.

*iv. Constitutional Avoidance*

"Finally, even if there were ambiguity in the statutory text," this Court would still reject the pre-filing arrest and detention interpretation "because of the grave constitutional concerns it raises." *Barbosa da Cunha*, 175 F.4th at 93. "Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Id*. (quoting *Jennings*, 583 U.S. at 286). This canon "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Id.* (quoting

*Jennings*, 583 U.S. at 296). As discussed, the filing interpretation is the proper construction of 1226(a)'s text, and thus the constitutional-avoidance canon is unnecessary.

But even assuming section 1226(a) were ambiguous and could be plausibly read to permit arrest and detention prior to filing, "it sounds constitutional alarms that would warrant its rejection." *Id*. at 94. The constitutional problem presented is the same constitutional problem the Supreme Court has routinely employed the canon to avoid: the possibility of indefinite detention. "A statute permitting indefinite detention of an alien would raise a serious constitutional problem." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The Supreme Court's section 1226 jurisprudence is based almost entirely on avoiding the constitutional problem of indefinite detention. In *Reno v. Flores*, the Court rejected respondents' claim that the section 1226(a)'s predecessor permitted indefinite detention of juveniles because "[t]he period of custody is inherently limited by the pending deportation hearing, which must be concluded with 'reasonable dispatch' to avoid habeas corpus." 507 U.S. 292, 314 (1993). In *Demore v. Kim*, the Court upheld mandatory detention under section 1226(c) "for the brief period necessary for [the noncitizen's] removal proceedings." 538 U.S. 510, 513 (2003). It distinguished *Zadvydas* on the ground that the detention there—continuing after removal proceedings concluded—was "'indefinite' and 'potentially permanent,'" while detention pending removal proceedings has "a definite termination point." *Id*. at 528–29. So too in *Jennings*, the Court rejected judicially-imposed six-month time limits on section 1226(c), designed to avoid indefinite detention, because the statute already specifies how long detention lasts: until the removal proceedings conclude. 583 U.S. at 303–04. In each of these cases, the

constitutional sufficiency of the detention scheme depended on the existence of an ongoing proceeding whose conclusion would end the detention.

The pre-filing reading recreates the indefinite detention problem these cases avoided. If issuance suffices to make a decision "pending," the government may simply issue the NTA, arrest the noncitizen on a warrant, and then detain them without ever filing the NTA with the immigration court. Under that reading, the "definite termination point" on which *Flores*, *Demore*, and *Jennings* relied exists only in theory. The termination point is definite only if there are pending proceedings that will produce a removal decision. Before filing, there is no proceeding that will produce a removal decision. And nothing—no law or regulation, no immigration judge or federal court—can compel the government to commence one. *See Matter of Ordaz*, 26 I&N Dec. 637, 641 (BIA 2015) ("the decision to commence removal proceedings lies in the sole discretion of the DHS."); *Matter of G-N-C-*, 22 I&N Dec. 281, 284 (BIA 1998) ("the decision to institute deportation proceedings involves the exercise of prosecutorial discretion and is not a decision which the Immigration Judge or the Board may review."); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 487 (1999) (holding that 8 U.S.C. § 1252(g) strips federal courts of jurisdiction to review the government's decision to commence proceedings). Combined, the issuance interpretation and the government's unreviewable prosecutorial discretion create a regulatory black site where the duration of detention depends entirely on a step only the government can take, at a time the government alone chooses. Throughout, the government would describe as "pending" a decision that no immigration judge has the power to render. That is the indefiniteness *Zadvydas* identified: detention whose end is not reasonably foreseeable. 533 U.S. at 699–701. If detention authority is

detached from removal proceedings, the period of custody is no longer "inherently limited by the pending deportation hearing." *Flores*, 507 U.S. at 314. The government could follow the proper sequence set by the regulation but then refrain from filing and detain indefinitely. This would invite courts to draw more lines that the statute does not contain and that *Jennings* prohibits.

The government may assure that it files promptly as a matter of practice. Perhaps it does. But the Court cannot construe statutes that authorize detention on the strength of the government's promises to use them responsibly. *Cf. United States v. Stevens*, 559 U.S. 460, 480 (2010) (the Constitution "does not leave us at the mercy of *noblesse oblige*"). Because a construction, once adopted, governs every case the statute reaches, the Court must consider the issuance reading not only as applied here or as might be applied in theory but at its "lowest common denominator." *See Clark v. Martinez*, 543 U.S. 371, 380–81 (2005). "In other words, when deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court." *Id*.

The availability of custody review does not cure the indefiniteness problem. A bond hearing is "separate and apart" from removal proceedings, 8 C.F.R. § 1003.19(d), and answers a different question from the one the constitutional concern presents. It asks whether a particular detainee should be released because he poses no danger and is likely to appear, not whether the proceeding that will end his detention will ever begin. An immigration judge who denies bond leaves the detainee in custody, and if the government

sits on the NTA, that custody has no definite end point. In *Demore*, the Court sustained detention under section 1226(c) even though no bond hearing was available because that detention would end when removal proceedings did. 538 U.S. at 528–31. The converse follows: the availability of a bond hearing does not save detention that has no end at all. And in *Zadvydas*, the Court found that the administrative custody reviews available to noncitizens held after the removal period did not dispel the constitutional concern with indefinite detention, in part because those reviews placed on the detainee the burden of proving that he should they released. 533 U.S. at 692. Bond review under section 1226(a) has the same feature: the detainee must demonstrate that they are neither a danger nor a flight risk. *Velasco Lopez v. Decker*, 978 F.3d 842, 849 (2d Cir. 2020). A scheme that permitted indefinite detention before filing, softened only by the possibility of bond—a rather remote one given the agency's "presumption of detention," *id.*—is not what Congress intended, and is precisely the scheme the canon exists to avoid.

The filing reading avoids these constitutional problems and the line-drawing exercises those problems invite. Arrest and detention under section 1226(a) begin together, once a decision is pending, and last only as long as the proceedings that will produce the decision. Before filing, the only arrest authority is section 1357(a)(2), with its likelihood of flight condition and prompt examination requirement. The statute thus ensures definiteness on both sides of the line—commencement on the front end, termination on the back end. Nothing in this conclusion requires the Court to supply a limit Congress did not enact. This Court holds only that the period during which section 1226(a) authorizes arrest and detention begins where the statute says it begins—upon filing of the NTA with the immigration court.

B. Federal Regulations Can and Must Be Harmonized with the Statute

The regulation on which the issuance theory relies provides:

> At the time of issuance of the notice to appear, or at any time thereafter and up to the time removal proceedings are completed, the respondent may be arrested and taken into custody under the authority of Form I-200, Warrant of Arrest. A warrant of arrest may be issued only by those immigration officers listed in § 287.5(e)(2) of this chapter and may be served only by those immigration officers listed in § 287.5(e)(3) of this chapter.

8 C.F.R. § 236.1(b)(1). Nearly all courts in this Circuit, including those that ultimately denied habeas, read this regulation as fixing the point at which section 1226(a) authority begins. Under this framework, the NTA must issue prior to the arrest warrant. While in accord with the regulation itself, this interpretation ignores the statutory conditions that qualify the regulation.

A regulation implements the statute under which it is promulgated; it is not a source of authority beyond it. An agency "literally has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Regulations "must be consistent with the statute under which they are promulgated," *United States v. Larionoff*, 431 U.S. 864, 873 (1977), and where possible "a regulation must be interpreted so as to harmonize with and further and not to conflict with the objective of the statute it implements," *Sec'y of Lab. v. W. Fuels-Utah, Inc.*, 900 F.2d 318, 320 (D.C. Cir. 1990) (quoting *Emery Mining Co. v. Secretary of Labor, Mine Safety and Health Administration*, 744 F.2d 1411, 1414 (10th Cir. 1984)). A regulation that cannot be reconciled with its statute is, to that extent, "a mere nullity." *Iglesias v. United States*, 848 F.2d 362, 366–67 (2d Cir. 1988) (quoting *Manhattan General Equipment Co. v. Commissioner*, 297 U.S. 129, 134 (1936)).

The question, then, is not whether 8 C.F.R. § 236.1(b)(1) can be read to authorize arrest and detention before an NTA is filed, but whether it can be read consistently with a statute that does not. It can. It sets the earliest point at which a warranted arrest may occur ("at the time of issuance of the notice to appear"), the latest point ("up to the time removal proceedings are completed"), and the officers who may issue and serve the warrant. Nothing in that text dispenses with the statute's separate requirement that a decision be pending. A warranted arrest under section 1226(a) therefore requires both that the Notice to Appear have issued, as the regulation provides, and that it have been filed with the immigration court, so that a removal decision is pending, as the statute provides.

This reading accords with the regulation's other terms. Under part 236.1(b)(1), *someone* may be arrested and detained at the time the NTA is issued. But who? The regulation specifies: "the respondent." That term is generally understood in law as "[t]he party against whom a motion or petition is filed." *Respondent*, BLACK'S LAW DICTIONARY (10th ed. 2014); WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 2001) ("one who answers in various legal proceedings"). Like "pending a decision," "respondent" presupposes the existence of an ongoing proceeding in which a noncitizen is currently a party. This ordinary use is supported by context. The regulation's choice of "respondent" is not accidental. DHS and EOIR know how to use the word "alien"; they do so nearly 600 times throughout Title 8 to describe "any person not a citizen or national of the United States."

8 U.S.C. § 1101(3).[10] In part 236.1, DHS did not mean just any noncitizen; instead, it chose "the respondent" to describe a certain subset of noncitizens. Every respondent is, by definition, an alien. But not every alien is a respondent. The difference is the ongoing proceeding. And an alien becomes a respondent only when those proceedings commence—when they are filed with EOIR.

Reading part 236.1 to authorize pre-filing arrest and detention places it in direct conflict with the statute. It would be inconsistent with the word "pending." A removal decision cannot be pending when a Notice to Appear is issued and then left unfiled in an immigration officer's pocket. Absent filing, there is no proceeding in which a removal decision can be pending. Nor is there any basis for attaching arrest and detention authority to the start of an undefined "removal process." This phrase is used in Title 8 only four times to describe administrative removal under the Convention Against Torture, 8 C.F.R. §§ 1208.18(d), 208.18, expedited removal for inadmissible aliens, 8 C.F.R. §

---

[10] The regulations generally distinguish between what a person is and the role they occupy. "Respondent" tracks the person's procedural role and governs the mechanics of adjudication: representation (8 C.F.R. § 1240.3), competency (8 C.F.R. § 1240.4), pleading (8 C.F.R. § 1240.10(c)), service (8 C.F.R. § 1240.13(a)), and scheduling (8 C.F.R. § 1240.17). "Alien" tracks statutory status. It appears where the regulation paraphrases INA eligibility criteria. For example, the statutory provision governing voluntary departure sets out the criteria for voluntary departure using the word "alien," and the corresponding regulations repeat that criteria almost word for word even though the person is still a party to removal proceedings at that point. *Compare* 8 U.S.C. § 1229c(b)(1) *with* 8 C.F.R. § 1240.26(c)(1)(i)–(iv). The regulation says "alien" because the statute does. The same is true for removal in absentia. *Compare* 8 U.S.C. § 1229a(b)(5)(A) with 8 C.F.R. § 1003.26(c). The use of "alien" in these regulations reflects an attempt to accord with the statutory language, not a decision to treat the person as someone other than a party. "Alien" is also use where the regulation describes a statutory class (e.g., "arriving alien," "alien spouse," "alien entrepreneur," "unremovable alien"). This role-status distinction is apparent in the burden-of-proof provision, which places "respondent" in the operative text beneath headings captioned "Deportable aliens" and "Arriving aliens." 8 C.F.R. § 1240.8(a)–(b). It is also apparent in the bond regulation, which calls the person seeking redetermination "a respondent" while using "alien" to define ineligible classes. *Compare* 8 C.F.R. § 1003.19(b) *with* § 1003.19(h).

235.3(b)(3), and post-final-order removal, 8 C.F.R. § 241.13(e)(2).[11] The statute describes a "decision," not a process. An immigration officer may, colloquially speaking, initiate the "removal process" when it issues an NTA. But under the statute, a removal "decision" is made only by an immigration judge in removal proceedings, and that decision becomes pending only when the NTA is filed with the immigration court.

The Court also reads this regulation in harmony with regulations governing service of the NTA. A charging document "must include a certificate showing service on the opposing party pursuant to § 1003.32." 8 C.F.R. § 1003.14(a). Part 1003.32, in turn, provides that, unless all parties are using EOIR's electronic filing system "in a specific case," "the party filing with the immigration court must serve a copy of the filing on the opposing party and include a certificate of service showing service on the opposing party with their filing." 8 C.F.R. § 1003.32(a), (c).[12] The statute independently requires that the Notice be "given in person to the alien" or, if personal service is not practicable, by mail. 8 U.S.C. § 1229(a)(1). Read together, the statute and the regulations provide that the proper sequence is issuance, service, and then filing, with the certificate of service attached. Nothing prevents the government from issuing an arrest warrant before any of these steps. But the statute and the implementing regulations provide that the government may not arrest or detain on that warrant until these steps are completed.

---

[11] ICE also uses "removal process" in the post-final-order sense. *See* U.S. Immigration & Customs Enforcement, Removal, ice.gov/remove [https://perma.cc/R93X-LANY]. It would likely describe issuance of the NTA as a step in its "immigration enforcement process" distinct from its "removal process."

[12] Assuming the noncitizen is not using the electronic system before the case exists, the paper-service rule likely governs in most cases.

C. Petitioner’s Arrest and Detention Violated Section 1226(a)

Here, the government issued a warrant and then arrested Mr. G.C. on that warrant. Then it issued and served an NTA. Then it filed electronically with the immigration court. The government does not dispute that this sequence violated its regulations because the arrest preceded the issuance of the NTA. But the more fundamental problem is that it violated section 1226(a) because the arrest and detention preceded the filing of the NTA with the immigration court. Because the government arrested and detained Mr. G.C. before a decision on his removal was pending, the arrest and detention violated section 1226(a).

II. Petitioner’s Continued Detention Violates Section 1226(a)

Because the government arrested and detained Petitioner before the removal decision was pending, that arrest and detention was unlawful under section 1226(a). The statute provides separately that subsequent filing cannot cure this defect. Section 1226(a)(1) states that “pending such decision,” the government “may continue to detain the arrested alien.” 8 U.S.C. § 1226(a)(1). The “arrested alien” refers to the alien arrested “on a warrant” and “pending a decision.” Section 1226(a)(1) authorizes the government to continue detaining that alien. It does not authorize the government to continue detaining an unlawfully arrested alien. Because Petitioner’s arrest and detention under section 1226(a) was unlawful, his continued detention violates section 1226(a)(1). Arrest and detention on a defective warrant might be curable, *Gamez-Quintanilla*, 2026 WL 2517655, at *2 (quoting *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 158 (1923)), but arrest and detention without statutory authority is not.

III. Petitioner’s Unlawful Arrest Under Section 1226(a) Cannot Be Justified by Section 1357(a)(2)

Petitioner argues that because the arrest occurred before the NTA issued, the arrest should be treated as a warrantless arrest under section 1357(a)(2) rather than a warranted arrest under section 1226(a). (Pet. ¶¶ 54–55). Similar logic has been employed to the reverse effect. *Loja Loja v. Acting Field Off. Dir.*, No. 26 Civ. 5368 (JGK), 2026 WL 2321934, at *4 (S.D.N.Y. Aug. 10, 2026) (holding that even if the arrest was unlawful under the regulations, it was harmless because “the same officer could have arrested the same petitioner during the same interaction by a route that required less process,” a warrantless arrest under section 1357(a)(2)). Enforcing those regulations might even perversely encourage more warrantless arrests. *Id*. at *4 n.3. This logic is wrong in either direction.

First, the lawfulness of custody is measured by the authority under which the government actually holds the detainee, not by an authority it might have invoked on findings it never made.[13] The government did not invoke that authority here, and it affirmatively states that “Petitioner has been detained pursuant to 8 U.S.C. § 1226(a).” (Gov’t Opp’n at 2).

Second, the alleged perverse incentive exists only if the government is not held to the conditions prescribed in section 1357(a)(2). Section 1357(a)(2) provides that

[13] *Parada Cruz v. Mullin*, 837 F. Supp. 3d 404, 411 (E.D.N.Y. 2026) (“in none of these cases have Respondents proceeded on a warrantless basis. Having issued warrants—presumably because they believed they were required to—they cannot justify detention by relying on an alternative procedure they opted not to use, and wave away the warrants as unnecessary. The fact is warrants were used and relied on by the officers for the detention and the USAO in their papers opposing the habeas petitions. Bad facts cannot be ignored to create fictional and alternative realities.”).

immigration officers "shall have power without warrant" to "arrest any alien in the United States," but only if two conditions are met: the officer must have "reason to believe" that (1) the alien is "in the United States in violation of any such law or regulation"; and (2) the alien "is likely to escape before a warrant can be obtained for his arrest." Unlike individualized custody determinations and bond hearings, which place the burden on the detainee to establish that they are not a flight risk, section 1357(a)(2) shifts the burden on the government to establish the risk of flight. The phrase "reason to believe" has long been understood to mean probable cause. *See Au Yi Lau v. U.S. Immigr. & Naturalization Serv.*, 445 F.2d 217, 222 (D.C. Cir. 1971); *United States v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975) ("The words of the statute 'reason to believe' are properly taken to signify probable cause."); *Tejeda-Mata v. Immigr. & Naturalization Serv.*, 626 F.2d 721, 725 (9th Cir. 1980) ("The phrase 'has reason to believe' has been equated with the constitutional requirement of probable cause."); *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010) ("Because the Fourth Amendment applies to arrests of illegal aliens, the term 'reason to believe' in § 1357(a)(2) means constitutionally required probable cause."); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 49 (D.D.C. 2025).

Under that standard, ICE could not have arrested Mr. G.C. under section 1357(a)(2). After interrogating and running records checks, the officers had reason to believe that Mr. G.C. was unlawfully present in the United States. That satisfies the first condition. But the record does not indicate that officers had probable cause to believe that Mr. G.C. was likely to escape before a warrant could be obtained for his arrest. Just the opposite, in fact. By the government's own account, it was a "consensual encounter." (Pet., Ex., A at 2). Mr. G.C. complied with officers' requests for identification and freely

answered their questions. He did not flee the encounter.[14] He remained while ICE ran records checks, and those records checks confirmed that Mr. G.C. had no criminal history. Given the totality of circumstances, at the time ICE issued the arrest warrant, ICE had not established probable cause that Mr. G.C. was likely to escape prior to obtaining a warrant by lawful means. ICE could have obtained his home address, issued and served a Notice to Appear at that address, filed the Notice to Appear, and then obtained a warrant for his arrest.[15] Nothing in the record at the time of the arrest indicates that Mr. G.C. would have fled during that regular process.

IV. <u>Habeas is Warranted</u>

A federal court may grant a writ of habeas corpus to a person "in custody in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2241(c)(3). "Habeas is at its core a remedy for unlawful executive detention. The typical remedy for such detention is, of course, release." *Munaf v. Geren*, 553 U.S. 674, 693 (2008). Habeas corpus "is an 'adaptable remedy,' the 'precise application and scope' of which changes 'depending upon the circumstances.'" *Velasco Lopez*, 978 F.3d at 855 (quoting

---

[14] Nor would fleeing the encounter change the outcome. Refusing to cooperate with officers and leaving an encounter cannot, without more, furnish probable cause required for detention. *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). Unprovoked flight may supply reasonable suspicion required to stop and individual for further investigation, *id*., but it does not supply probable cause of flight required to arrest and detain without a warrant.

[15] *Arizona v. United States*, 567 U.S. 387, 407 (2012) ("As a general rule, it is not a crime for a removable alien to remain present in the United States. If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent. When an alien is suspected of being removable, a federal official issues an administrative document called a 'Notice to Appear.' The form does not authorize an arrest. Instead, it gives the alien information about the proceedings, including the time and date of the removal hearing.") (citations omitted).

*Boumediene v. Bush*, 553 U.S. 723, 779 (2008)). Courts must "dispose of the matter as law and justice require." 28 U.S.C. § 2243.

Some courts in this Circuit have denied the writ because, on their view, the sequencing error—arresting before the NTA issued—is a mere procedural violation not sufficiently prejudicial or egregious to warrant the writ. *See, e.g., Gagea v. Maldonado*, No. 26-CV-4817 (RPK), 2026 WL 2859032, at *2–3 (E.D.N.Y. Sept. 23, 2026); *Loja Loja*, 2026 WL 2321934, at *4–6; *Gamez-Quintanilla*, 2026 WL 2517655, at *2.[16] The government asks this Court to do the same. (Gov't Opp'n at 2 n.2). These courts arrive at this conclusion by applying the *Accardi* doctrine.

The *Accardi* doctrine applies to federal regulations; it requires a federal agency to follow them. *Montilla v. I.N.S.*, 926 F.2d 162, 166 (2d Cir. 1991) (referencing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)). When a regulation does not affect fundamental rights, the noncitizen must show that the agency's violation of the regulation prejudiced them. *Waldron v. INS*, 17 F.3d 511, 518 (2d Cir. 1993); *Rajah v. Mukasey*, 544 F.3d 427, 446–47 (2d Cir. 2008). The prejudice rule weighs the benefits of release to the noncitizen against the likely deterrent effects and the administrative cost to agency. *Waldron*, 17 F.3d at 519; *Rajah*, 544 F.3d at 447. The district courts that have denied relief for arrests preceding the issuance of a Notice to Appear applied this framework. They asked whether part 236.1(b)(1) protects a fundamental right, concluded that a rule

[16] *See also A.P.A. v. Arteta*, No. 26 Civ. 3334 (AS), 2026 WL 1587452, at *3 (S.D.N.Y. June 3, 2026) (denying unconditional release because procedural failure was merely procedural, but ordering a new custody determination and bond hearing because "law and justice" require).

governing "the sequence in which two documents issue" does not, and required a showing of prejudice that the petitioners could not make. *Loja Loja*, 2026 WL 2321934, at *4; *Gagea*, 2026 WL 2859032, at *2–3; *Gamez-Quintanilla*, 2026 WL 2517655, at *2. On their reading, release was disproportionate to the violation, and the balancing test tipped in the government's favor.

This analysis does not apply to a statutory violation. Courts do not "predict how the government will react to a ruling that requires it to follow the law and then proceed[] to assess the resulting 'costs' and 'benefits.'" *Niz-Chavez*, 593 U.S. at 171. However inconvenient the government may find the statute's requirements, "pleas of administrative inconvenience and self-serving regulations never 'justify departing from the statute's clear text.'" *Id.* at 169 (quoting *Pereira v. Sessions*, 585 U.S. 198, 217 (2018)).

Nevertheless, the cost/benefit analysis favors release. It promotes separation of powers principles by holding the Executive to the lines that Congress drew and ensuring courts adhere to those same lines. *See Boumediene*, 553 U.S. at 742–43, 765–66; *Jennings*, 583 U.S. at 297, 303–04. That clarity improves the efficiency of the immigration system at large. It tells immigration officers when a warrant may be executed, it tells noncitizens and their counsel when detention under section 1226(a) is lawful, and it tells courts what to decide. Without that clear line, every petition results in litigation over degree, creating inefficiency the prejudice rule exists to prevent. *Waldron*, 17 F.3d at 519; *Rajah*, 544 F.3d at 447.

Release also functions as a deterrent against future misconduct or ongoing intransigence. *Velasco Lopez*, 978 F.3d at 855; *cf. Montilla*, 926 F.2d at 169. A government that knows unauthorized detention will end in release has every reason not

to detain without authority. Conversely, a government that can rely on courts to excuse routine violations as inconsequential will continue to test the limits of its impunity.

Deterrence is especially warranted in these circumstances. Arrests preceding the Notice to Appear have recurred across this Circuit, despite repeated judicial rulings that they are unlawful. *Parada Cruz*, 837 F. Supp. 3d at 411; *Sanchez Alfaro v. Mullin*, 831 F. Supp. 3d 177, 186 (E.D.N.Y. 2026). While the Court remains hopeful that respondents—executive officers of the United States bound by oath to support the Constitution, *see* U.S. CONST. art. VI—will, consistent with their constitutional duty, "endeavor to responsibly resolve operational issues on their own initiative," *Sanchez Alfaro v. Mullin*, No. 26-CV-0766 (GRB), 2026 WL 1142478, at *9 (E.D.N.Y. Apr. 27, 2026), the systematic intransigence demonstrated by the government makes this Court doubtful of its motivation to self-correct.

Finally, release promotes fairness and public trust. "If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Niz-Chavez*, 593 U.S. at 172. Public confidence in the administration of the immigration laws depends on this reciprocity. An agency's careless observance of its required procedures "weakens its effectiveness in the eyes of the public because it exposes the possibility of favoritism and of inconsistent application of the law." *Montilla*, 926 F.2d at 169. That concern is greater when the procedure disregarded is one Congress enacted, and greater still when the government holds noncitizens strictly to the law while asking courts to excuse its own departures. *Niz-Chavez*, 593 U.S. at 169–170. Release for lack of statutory authority shows that the limits Congress placed on the power to detain are enforced as law, against

the government as against anyone else. This holding "may seem semantic," "[b]ut words are how the law constrains power." *Id.* at 172. The Court takes those words seriously and declines to let the government satisfy the statute in the manner most convenient to it.

V. Other Constitutional and Statutory Claims

Because Petitioner's arrest and detention violated the statute, the Court declines to consider Petitioner's other arguments. Lack of statutory authority is sufficient to warrant release. *See Ex parte Endo*, 323 U.S. 283, 297 (1944) ("We are of the view that Mitsuye Endo should be given her liberty. In reaching that conclusion we do not come to the underlying constitutional issues which have been argued. For we conclude that, whatever power the War Relocation Authority may have to detain other classes of citizens, it has no authority to subject citizens who are concededly loyal to its leave procedure.").

## CONCLUSION

The petition for a writ of habeas corpus is GRANTED. Petitioner Mr. G.C. is to be released forthwith. Respondents are directed to file a letter regarding their compliance with this order by Wednesday, October 28, 2026, by 5:00 P.M.

Once the notice of release is received by the Court, the Clerk of Court is respectfully directed to enter final judgment and close the case.

SO ORDERED.

/s/ Ramón E. Reyes, Jr.

RAMÓN E. REYES, JR.
United States District Judge

Dated: October 27, 2026
Brooklyn, New York